Receipt number 9998-5154527

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

**ZAMANTHA TAPIA;**
**MARA DUNN;**
**JENNIFER WILMOT;**
**JENNIFER CRISOSTOMO;**
**KIMBERLY COLON; and**
**MELISSA LARSON,**
on behalf of themselves and all other
individuals similarly situated,

                          Plaintiffs,

**v.**

**THE UNITED STATES OF AMERICA,**

                          Defendant.

Case No. ___19-108 C___

## CLASS ACTION COMPLAINT

### Preliminary Statement

The caregivers of seriously injured veterans deserve and are eligible for compensation

and benefits for their aid to veterans under federal statute and regulations. The Department of

Veterans Affairs (the "DVA," or the "VA") has wrongfully denied the plaintiffs, and the

proposed classmembers they seek to represent, proper compensation for their services in caring

for seriously injured veterans. The DVA has failed to follow federal law, regulations, and

directives in administering the "Program of Comprehensive Assistance for Family Caregivers"

("PCAFC," or "Family Caregiver Program") entitlement, which was established by 38 U.S.C. §

1720G. The DVA has published regulations that appoint the Veterans Health Administration

("VHA") as the sub-agency of the DVA, responsible for administering the PCAFC.

This complaint seeks to recover monies due to plaintiff caregivers for their care of seriously injured veterans who were injured during their military service. The defendant has failed to properly assess and adjudicate plaintiffs' eligibility and entitlement to compensation, denied them caregivers support, reduced their compensation award, or has terminated their compensation contrary to law and regulations.

Plaintiffs, and the proposed class members they seek to represent in this lawsuit, are the primary family caregivers of veterans of the United States Army, United States Air Force, United States Coast Guard, United States Marine Corps, and the United States Navy who were wrongfully denied caregiver support, assigned a low caregiver support level (hereinafter "Tier level"), reduced in Tier level, and/or were revoked from receiving family caregiver support. As a result of these wrongful actions, the plaintiffs were denied proper caregiver support, substantial monetary compensation, and denied important rights guaranteed to them under the law.

In the years since the establishment of the PCAFC through 2017, there were several media reports about problems with the Family Caregiver Program, including issues with the wrongful revocation of benefits.

(See, e.g., https://www.thenewstribune.com/news/local/military/article56571708.html, last accessed on December 31, 2018;

https://www.disabledveterans.org/2017/02/20/presidents-day-va-caregiver-program-investigation/, last accessed on December 31, 2018;

https://www.oregonlive.com/watchdog/index.ssf/2017/03/frustration_few_answers_after.html, last accessed on December 31, 2018;

https://www.foxnews.com/politics/congress-wants-answers-as-disabled-vets-caregivers-say-va-stripping-benefits, last accessed on December 31, 2018;

https://www.wavy.com/news/local-veteran-tries-to-recover-caregiver-benefit/1100122230, last
accessed on December 31, 2018.)

Additionally, there were several Congressional hearings regarding concerns with the
PCAFC, with statements from advocates from the veteran community provided to Congress.
(See, e.g.,

https://www.govinfo.gov/content/pkg/CHRG-112hhrg68452/html/CHRG-112hhrg68452.html,
last accessed on December 31, 2018;

https://www.woundedwarriorproject.org/media/1279/veterans_affairs__caregiver_program-
_assessing_current_prospects_and_future_possibilities.pdf, last accessed on December 31,
2018.)

As a result of the widespread concerns about the implementation and execution of the
PCAFC, in April 2017, the VA Secretary ordered an internal review of the program. This review
was conducted by the VA Office of the Inspector General ("VAOIG," or "OIG"). On August 16,
2018, the VAOIG issued a report (# 17-04003-222) which stated, *inter alia*, the following (with
emphasis added):

- "Why the OIG conducted the investigation:
  The Veterans Health Administration (VHA) reported spending over $464 million to run
  the Caregiver Support Program (CSP) in FY 2017. **This was a dramatic increase of
  about 321 percent from the approximately $110 million VHA spent during the
  program's first full year of operations in FY 2012.** [fn omitted] The majority of the
  increase is the result of a **significant enrollment increase in the Program of
  Comprehensive Assistance for Family Caregivers** (Family Caregiver Program) … In
  FY 2017, VHA reported that family caregiver stipend payments accounted for about 85
  percent of the CSP's total spending. For FY 2018, VHA is operating the CSP on an
  almost $840 million budget."

3

- "In April 2017, **the VA Secretary ordered an internal review** following concerns reported by Congress and in the media that veterans and their **caregivers were being inappropriately discharged from the Family Caregiver Program.**"

- "What the OIG Found

  **Eligible veterans and their caregivers did not always receive consistent and appropriate access to the Family Caregiver Program.** The OIG found that most veterans were made to wait too long for approval of their program enrollment applications. CSCs ["Caregiver Support Coordinators"] did not determine veterans' eligibility within 45 calendar days, as required, for an estimated 65 percent of the 1,822 veterans approved for the Family Caregiver Program from January through September 2017. **The OIG also found that VHA did not appropriately apply eligibility criteria when initially enrolling veterans into the program."**

  "**VHA also did not consistently monitor and document the health and well-being of an estimated <u>50 percent</u> of the 1,604 veterans it discharged from the program from January through September 2017.** The OIG found that clinicians and CSCs either did not adequately document **how much veterans' health conditions changed, or failed to routinely monitor these veterans and their caregivers <u>prior to the clinical reassessment that led to their program discharge.</u>** Without consistently monitoring and documenting changes in these veterans' health conditions, and seeking a timely clinical reassessment of eligibility based on those changes, **VHA risked providing an inappropriate level of care** or extending caregiver benefits to veterans who were no longer eligible."

- "**VHA failed to effectively run the Family Caregiver Program because it did not establish governance that promoted accountability for program management.** As a result, medical facility directors operated the Family Caregiver Program without performance goals to evaluate application processing timeliness, the accuracy of initial program eligibility determinations, and the consistency of monitoring enrolled veterans and their caregivers. **Furthermore, there were no requirements that veterans' program eligibility and need for care were reassessed as a result of the routine monitoring sessions that CSCs are required to perform four times a year. In**

**addition, some Veterans Integrated Service Network directors suffered a compromised ability to effectively monitor the consistent operation of the program across their networks.** These directors assigned the CSP oversight and monitoring duties to facility CSCs. These assignments poorly positioned program leads who were responsible for providing oversight across the network through quality assurance audits, but were also responsible for operating a facility-level Family Caregiver Program in the same network. In addition to these governance issues, VHA did not establish a staffing model to ensure medical facilities were well equipped to manage the program's workload, including processing veteran and caregiver applications and routine monitoring of the veteran and their caregiver."

- **"VHA Did Not Consistently Monitor Veterans and Their Caregivers**

**VHA discharged an estimated 50 percent of 1,604 veterans from the program from January through September 2017 whose health condition had not been consistently monitored, as required.** The audit team found that clinicians and CSCs failed to routinely monitor these veterans and their caregivers, or failed to adequately document the extent to which veterans' health conditions changed. A documented change in a veteran's health condition should lead to a reassessment of the need for care, which could lead to a different tier level or discharge…CSCs and clinicians **should perform monitoring no less than every 90 days.** These procedures include an evaluation of a veteran's and caregiver's physical and emotional well-being **to identify any additional needs**. This monitoring is also intended to review the adequacy of care and supervision provided, **and could lead to an identification of a change in condition that may warrant a clinical reassessment of eligibility. The National CSP Director reported to the OIG that there is no requirement in the regulations or the directive for a clinical reassessment. However, the National CSP Office provided guidance to CSCs that reassessments are appropriate if a veteran's health condition has changed.** This change can be noted by the veteran or caregiver self-reporting; during monitoring sessions; or through other means, such as clinical visits to other VHA programs."

"While monitoring is specified in the directive, it is also vital to assess the ongoing eligibility of enrolled veterans. Monitoring is essential to identify **when a veteran's health has declined, and more care is needed**, or when a veteran's health has improved, necessitating less care or even discharge from the program. However, the directive does not describe actions CSCs should take when considering the eligibility of veterans during monitoring sessions.

In response to concerns about discharges, **the National CSP Director issued guidance in July 2017 outlining how CSCs should communicate with veterans and caregivers** about their increasing independence and a potential future discharge from the program. [fn omitted]. This guidance also detailed how CSCs should conduct eligibility reassessments and **how veterans' tier levels should be gradually reduced before** they are discharged from the program. The audit team found that CSCs did not consistently gradually reduce veterans' tier levels before being discharged from the program from August through September 2017—after the guidance was issued."

- "Conclusion

    Veterans encountered application delays, inaccurate initial eligibility determinations, and inconsistent monitoring at medical facilities. **Until the VHA Executive in Charge takes steps to ensure effective program management, VHA risks not providing the services and support needed by eligible veterans and their caregivers.**"

The VHA responded to the findings and recommendations of the VAOIG and agreed in several respects that the VHA has failed to properly administer the PCAFC. Included in the VAOIG Recommendations and the VHA's response was the following:

- "Recommendation 1: The Executive in Charge, Veterans Health Administration, will establish a governance environment for the Program of Comprehensive Assistance for Family Caregivers to ensure medical facilities process veteran applications within the required 45-day timeliness standard, consistently monitor veterans and their caregivers, adequately document the results and changes in veterans' health status, and adjust the level of support provided or discharge veterans and their caregivers, as appropriate."

    o "VHA Comments: Concur

"The Veterans Health Administration (VHA) Caregiver Support Program Office **will establish governance for the Program of Comprehensive Assistance for Family Caregivers (PCAFC).** The governance will determine performance goals and metrics in order to evaluate application timeliness, accuracy of the initial program eligibility determinations, and ensure consistent monitoring of enrolled Veterans and their caregivers.

Status Target Completion Date
In progress December 2018."

- "Recommendation 2: The Executive in Charge, Veterans Health Administration, will take steps to ensure caregiver support coordinators are properly applying eligibility criteria **with processes such as pre or post approval reviews**, to ensure the accuracy of all veteran eligibility determinations.

  o   VHA Comments: Concur

  The Caregiver Support Program Office recognizes the importance of making accurate Veteran eligibility determinations in order to reduce fraud or waste for inappropriate stipend payments. The Caregiver Support Program Office will take steps to ensure Caregiver Support Coordinators (CSC) and VHA staff involved in making eligibility decisions, apply appropriate eligibility criteria. These steps include:

  1.   Implement required clinical eligibility training for all new CSCs and Veterans Integrated Service Networks (VISN) leads.

  2.   Provide annual clinical eligibility refresher trainings for CSCs and VISN leads.

  3.   Develop and implement annual training for VHA clinical providers who participate in eligibility determinations and the interdisciplinary clinical staff responsible for conducting home visits, on the clinical eligibility requirements.

  Status Target Completion Date
  In progress June 2019."

- "Recommendation 3: The Executive in Charge, Veterans Health Administration, **will** update Directive 1152, Caregiver Support Program**, to include a well-defined process for documenting changes in veterans' health conditions during monitoring assessments to determine if those changes warrant a reassessment of the need for care or the level of care in respect to eligibility for the program.**"

  o   "VHA Comments: Concur in principle

7

**VHA agrees that the process for documenting changes in Veteran's health conditions requires written clarification**, however, revising Directive 1152 is unlikely to ensure the field has sufficient information to effectively implement those processes. The Caregiver Support Program Office will develop Standard Operating Procedures to further define the process for monitoring and documenting changes in Veterans' functional status to ensure timely reassessment of clinical eligibility. **Consistent monitoring and documentation of Veterans' changing health conditions in the medical record will ensure that Veterans receive the appropriate level of care and determine that the Veteran's existing eligibility status is appropriate.**

Additionally, the Caregiver Support Program Office will develop a training plan and provide subsequent staff training and materials to provide further education on the monitoring process and expectations, to include guidance on the type and frequency of monitoring assessments, documentation of such assessments, and communication of such assessments to participants of the Program of Comprehensive Assistance for Family Caregivers. The Caregiver Support Program Office will determine the feasibility of implementing a managerial cost accounting code to identify specific monitoring visits to be provided by clinical staff in the Veteran's home, via telephone, through telehealth or through a face-to-face visit at a medical center. The Caregiver Support Program Office will ensure these Patient Care Encounters from the medical record are properly recorded in the National Patient Care Database for the purposes of ensuring adequate workload capture of this required monitoring. The Caregiver Support Program Office will monitor the impact of this training plan through targeted audits and through the implementation of a site visit plan.

Status Target Completion Date
In progress February 2019."

- "Recommendation 4: The Executive in Charge, Veterans Health Administration, will establish assessment guidelines that caregiver support coordinators should follow **when a veteran's need for care changes.**

  o   VHA Comments: Concur

  **The Caregiver Support Program will establish clear guidelines for VHA clinical staff to follow when a Veteran's level of functioning has changed.** The Caregiver Support Program Office **agrees** that timely action to reassess a Veteran's eligibility based upon a change in the Veteran's level of functioning **is a critical component to ensure that Veterans are receiving the appropriate level of support and services.** At completion of this action, VHA will provide OIG with a copy of these guidelines.

  Status Target Completion Date
  In progress January 2019."

8

See, "Veterans Health Administration - Program of Comprehensive Assistance for Family Caregivers: Management Improvements Needed," https://www.va.gov/oig/pubs/VAOIG-17-04003-222.pdf (last accessed on December 30, 2018) (emphasis added).

The VHA has acknowledged and concurs that it has failed to properly administer the PCAFC. Though the VHA has concurred with the recommendations of the VAOIG regarding its failures, the plaintiffs and those similarly situated continue to suffer from the effects of the unlawful and wrongful denial of compensation and benefits. This is shown by the continued media reports of the same issues raised in this complaint.

(See, e.g., https://www.npr.org/2018/12/18/677346997/va-still-arbitrarily-cutting-caregivers-from-program-even-as-it-aims-to-expand, last accessed on December 31, 2018; https://www.military.com/daily-news/2018/12/21/va-suspends-all-discharges-caregiver-program.html., last accessed on December 31, 2018). While the promise to temporarily stop discharges from the PCAFC during a review of the program is a positive step, nothing in the steps taken by the VA, the VHA, or the defendant addresses the prior failure to properly compensate the plaintiffs, the VA's termination of their PCAFC compensation and benefits, or establish a plan to pay them or correct the denial of past compensation and benefits for the plaintiffs, or those similarly situated. The defendant appears to acknowledge its failures to properly assess claims on an ongoing basis but fails to address or correct the denial of compensation for those who have previously been denied proper compensation and benefits. The defendant and the VHA owe monies to those who they have wronged, and this complaint seeks recovery of the monies due as a result of the failure of the defendant to properly administer the Family Caregiver Program.

Despite Congress' clear command to establish and provide comprehensive assistance for

family caregivers of eligible veterans, the DVA, acting through the VHA, has failed to follow substantive law; to implement lawful procedures in assessing and providing services to veterans and family caregivers; and to provide monetary compensation to family caregivers. The DVA's failures include, but are not limited to, the failure to complete accurate assessments in accordance with VHA regulations to determine veteran and caregiver eligibility and entitlements; to pay initial or continued monthly stipends to caregivers who qualify for such payments; to provide medical care to caregivers; to have properly trained personnel perform eligibility assessments; to reinstate entitlements (with back pay) when the DVA determined revocation or reduction in Tier level was improper, and to provide notice of the right and an opportunity to appeal a denial, Tier level assignment, reduction, or termination of caregiver support eligibility, and to adjudicate appeals in accordance with law and regulation.

This complaint documents a break in faith by the DVA, and the VHA, in honoring the service of plaintiffs, veterans, and the proposed class members by denying timely and accurate entitlement decisions for compensation and benefits in the PCAFC program. The DVA, the VHA, and the nation owe a duty to care for our veterans and to compensate family caregivers of seriously disabled veterans who qualify for PCAFC compensation and benefits. Explicit in these obligations is the right to the full and correct payment of a monthly stipend for family caregivers, the right to respite care, compensation for lodging and subsistence, and the right to medical care and counseling. This complaint seeks to recover the monies and benefits due to the plaintiffs, and the proposed class members they seek to represent, as a result of the defendant's failure to honor the requirements of law and its obligations to those it has mistreated by failing to compensate them properly.

**Nature of the Action**

Plaintiffs bring this action against the defendant and allege the following:

1.       This is an action to recover monies due to the plaintiffs, and the proposed class members they seek to represent, who were wrongfully found ineligible for family caregiver support, erroneously assigned lower than their proper Tier level, wrongfully reduced in Tier level, or were wrongfully revoked from the PCAFC by the DVA and the VHA.

2.       This complaint also seeks to recover expenses incurred by the plaintiffs and the proposed class members, based on their actual payments made out of pocket after they were denied the assistance of statutorily and regulatory mandated family caregiver support, in order to provide medical care, respite care, counseling, travel, and lodging, and subsistence that they were wrongfully denied.

3.       The Program of Comprehensive Assistance for Family Caregivers was created by Public Law 111-163, the Caregivers and Veterans Omnibus Health Care Services Act of 2010, which was signed into law on May 5, 2010. It was codified by 38 U.S.C. § 1720G, which required the DVA to "establish a program of comprehensive assistance for family caregivers of eligible veterans," as well as a program of "general caregiver support services." 38 U.S.C. § 1720G(a),(b).

4.       The DVA has been administering the PCAFC continuously since May 5, 2011, under an interim final rule published in the Federal Register (76 FR 26172) as well as 38 Code of Federal Regulations, Chapter 1, Part 71 (January 9, 2015, in substantial form with 76 FR 26172). The purpose of the program is to provide certain medical, travel, training, and financial entitlements to the caregivers of veterans who were seriously injured on or after September 11, 2001.

5.      The Veterans Health Administration Directive ("VHAD") 1152 (June 14, 2017, and as amended, October 4, 2018) provides background on the PCAFC. The directive specifies DVA staff responsibilities for the implementation of the Program of Comprehensive Assistance for Family Caregivers and the Program of General Caregiver Support Services, collectively referred to as the Family Caregiver Support Program. The directive describes aspects of program operations, including the different types of caregivers, veteran eligibility criteria, caregiver eligibility criteria, appeal rights, and the services and entitlements available to Family Caregivers.

6.      In plain terms, the DVA has failed to provide plaintiffs, and the proposed class members they seek to represent, with compensation and other entitlements due to them under federal law, regulations, and directives. Whether a conscious decision to deny plaintiffs and the proposed class members their rights, bad faith, or simple error on the part of defendant, the result is the same – the denial of benefits, services, and compensation due to plaintiffs, and the proposed class members, by law which this action seeks to recover on their behalf.

## JURISDICTION

7.      This Court has jurisdiction over this action pursuant to the Tucker Act, 28 U.S.C. § 1491(a)(1). The statutory basis for invoking jurisdiction is 38 U.S.C. § 1720G.  This statute is money-mandating. This complaint alleges money damages in excess of $10,000.

8.      The regulatory bases for invoking the jurisdiction of this Court are 38 CFR Chapter I, Part 71,  "Caregivers Benefits and Certain Medical Benefits Offered to Family Members of Veterans," and VHAD 1152 ((and 1152(1)), "Caregiver Support Program." As alleged in this complaint, these regulations are money-mandating. This complaint alleges money damages in excess of $10,000.

9.      The Veterans Judicial Review Act ("VJRA") does not deprive this court of subject matter jurisdiction because the plaintiffs, and those they seek to represent, are not necessarily veterans in order to qualify for the entitlements they claim, and they are not seeking a benefit or service that falls within the purview of 38 U.S.C. § 511(a).  Plaintiffs, and those they seek to represent, were entitled to family caregiver support under the PCAFC but were denied, reduced, or terminated from receiving compensation and benefits based on the VHA's failure to follow federal law and regulation. Further, plaintiffs have no right to seek review at the Board of Veterans Appeals ("BVA") because this is a VHA program and is not a Veterans Benefits Administration ("VBA") program. "In order to obtain review by the Court of Appeals for Veterans Claims ("CAVC") of a final decision of the Board of Veterans' Appeals, a person adversely affected by such decision shall file a notice of appeal with the Court within 120 days after the date on which notice of the decision is mailed pursuant to section 7104(e) of this title." 38 USC § 7266. Plaintiffs, and the proposed class members they seek to represent, have no appellate rights to review of the decisions in their cases by either the BVA or CAVC and, therefore, the VJRA does not deprive this Court of jurisdiction.

10.      In accordance with 28 U.S.C. § 2501, this action is brought within six years of the date of each plaintiff's, and proposed class member's, denial, termination, reduction, erroneous Tier level assignment, and/or refusal of retroactive compensation after their eligibility was, or should have been, considered by DVA on the date they were improperly denied their due compensation, benefits, and/or allowances, as alleged in this complaint. Some of the claims in this complaint fall under the ambit of the "continuing claims doctrine." See Bevevino v. United States, 87 Fed. Cl. 397 (2009).

13

## PARTIES

11.    Zamantha Tapia is a citizen of the United States who resides in the State of Florida. In 2014, Ms. Tapia and her veteran fiancé, Mr. Cesar Silva, jointly applied for the Family Caregiver Program. On July 9, 2014, the VHA denied her application for designation as a family caregiver. In 2017, the couple submitted a new application. On February 9, 2018, the VHA again denied their application.  The DVA, acting through the VHA, did not follow the laws, regulations, and directives applicable to the determination of the award of proper entitlements and Tier level, and the revocation of Family Caregiver Program status, and unlawfully denied Ms. Tapia the monthly stipend compensation and other benefits that she was due.

12.    Mara Dunn is a citizen of the United States who resides in the State of Texas. In 2011, Mrs. Dunn and her veteran husband, Mr. Sterling Dunn, jointly applied for the Family Caregiver Program. In May 2011, the VHA approved her application, assigned her a Tier level 2 of compensation, and started paying Mrs. Dunn a monthly stipend. On April 29, 2015, the VHA terminated her from the Family Caregiver Program. The DVA, acting through the VHA, did not follow the laws, regulations, and directives applicable to the determination of the award of proper entitlements and Tier level, the reduction in Tier level, and/or the revocation of Family Caregiver Program status, and unlawfully denied Mrs. Dunn the monthly stipend compensation and other benefits that she was due.

13.    Jennifer Wilmot is a citizen of the United States who resides in the State of Georgia. In 2013, Mrs. Wilmot and her veteran husband, Mr. George Wilmot, jointly applied for the Family Caregiver Program. In August 2013, the VHA approved her application, assigned her a Tier level 2 of compensation, and started paying Mrs. Wilmot a monthly stipend. In August

2015, the VHA revoked her designation as a family caregiver and terminated her entitlements under the Family Caregiver Program. The DVA, acting through the VHA, did not follow the laws, regulations, and directives applicable to the determination of the award of proper entitlements and Tier level, the reduction in Tier level, and/or the revocation of Family Caregiver Program status, and unlawfully denied Mrs. Wilmot the monthly stipend compensation and other benefits that she was due.

14.     Jennifer Crisostomo is a citizen of the United States who resides in the State of Washington. In 2014, Mrs. Crisostomo and her veteran husband, Mr. Kenneth Crisostomo, jointly applied for the Family Caregiver Program. In 2014, the VHA approved her application, assigned Mrs. Crisostomo a Tier level 2 of compensation, and started paying Mrs. Crisostomo a monthly stipend. In August 2017, the VHA revoked her designation as a family caregiver and terminated her entitlements under the Family Caregiver Program. The DVA, acting through the VHA, did not follow the laws, regulations, and directives applicable to the determination of the award of proper entitlements and Tier level, the reduction in Tier level, and/or the revocation of Family Caregiver Program status, and unlawfully denied Mrs. Crisostomo the monthly stipend compensation and other benefits that she was due.

15.     Kimberly Colon is a citizen of the United States who resides in the State of North Carolina. In 2011, Mrs. Colon and her veteran husband, Mr. Stuart Colon, jointly applied for the Family Caregiver Program. In 2011, the VHA approved her application, assigned Mrs. Colon a Tier level 3 of compensation, and started paying Mrs. Colon a monthly stipend. In January 2016, the VHA reduced her compensation to Tier level 2 and, in November 2016, it again reduced her compensation to Tier level 1. On November 8, 2018, the VHA revoked her designation as a family caregiver and terminated her entitlements under the Family Caregiver Program. The

DVA, acting through the VHA, did not follow the laws, regulations, and directives applicable to the determination of the award of proper entitlements and Tier level, the reduction in Tier level, and/or the revocation of Family Caregiver Program status, and unlawfully denied Mrs. Colon the monthly stipend compensation and other benefits that she was due.

16.     Melissa Larson is a citizen of the United States who resides in the State of Texas. She is the fiancée of an eligible veteran, Mr. Josue Acevedo. In 2012, the previous family caregiver and Mr. Acevedo jointly applied for the Family Caregiver Program. In 2012, the VHA approved their application and assigned a Tier level 2 of compensation, and the previous caregiver began receiving a monthly stipend from the DVA as Mr. Acevedo's family caregiver. In September 2017, the VHA terminated the original family caregiver from the program and did not approve Ms. Larson after Mr. Acevedo requested to transfer from New York to Texas and to have Ms. Larson designated as his family caregiver. The DVA, acting through the VHA, did not follow the laws, regulations, and directives applicable to the determination of the award of proper entitlements and Tier level, the reduction in Tier level, and/or the revocation of Family Caregiver Program status, and unlawfully denied Ms. Larson the monthly stipend compensation and other benefits that she was due.

## FACTUAL ALLEGATIONS

### Primary Family Caregiver Background

17.     Congress established standards for assistance and support services for caregivers via statute, codified at 38 U.S.C. § 1720G. Under that statute, the Secretary of Veterans Affairs and the Department of Veterans Affairs are required to issue regulations to establish a program of comprehensive assistance for family caregivers of eligible veterans.

18.      The DVA published 76 FR 26172 on May 5, 2011, modified that part, 80 FR

1376, and promulgated 38 CFR Chapter I, Part 71, on January 9, 2015.

19.     The DVA issued a regulation, VHAD 1152, on June 14, 2017, further directing and implementing the requirements of 38 U.S.C. § 1720G, and 38 CFR Chapter I, Part 71.

20.     The DVA amended VHAD 1152, and published VHAD 1152(1), on October 4, 2018, adding standard operating procedures that are not available to the public. Unless specified, the citations to VHADs 1152 are VHAD 1152(1) are interchangeable.

21.     The DVA distinguishes between three types of caregivers: (1) Primary Family Caregivers, (2) Secondary Family Caregivers, and (3) General Caregivers. 38 U.S.C. § 1720G. The veteran eligibility and plaintiffs' claims, as alleged in this complaint, are all related to their status as *primary family caregivers.*

### Veteran Eligibility for Primary Family Caregiver Services Overview

22.     Congress established specific criteria for qualification as an eligible veteran. Congress determined an eligible veteran is any individual who is a veteran; has a serious injury which was incurred on or after September 11, 2001; and requires personal care services to assist with activities of daily living or supervision or protection. 38 U.S.C. § 1720G (a)(2).

23.     At all times relevant to this case and their claims, the plaintiffs provided caregiver services to eligible veterans as each veteran (by definition a veteran) had incurred or aggravated an injury or illness in the line of duty on or after September 11, 2001 and required personal care services for activities of daily living, supervision, or protection.

24.     Pursuant to 38 CFR § 71.20, an eligible veteran is any individual who is a veteran; has a serious injury incurred on or after September 11, 2001; requires personal care services for a minimum of six months to assist with activities of daily living, supervision or protection; a clinical determination has been made that it is in the best interest of the individual

to participate in the program; personal care services will not be simultaneously provided by another individual; the individual agrees to receive care at home; and the individual agrees to receive ongoing care from a primary care team. 38 CFR § 71.20.

25.     Pursuant to 38 CFR § 71.20, criteria establishing required personal care services for a minimum of six continuous months may be based on an inability to perform an activity of daily living; a need for supervision or protection; a Global Assessment Functioning (GAF) score of 30 or less, continuously during the 90-day period immediately preceding the date DVA received the application; or the individual has a service connected injury, has been rated 100 percent disabled by the VA, and has been awarded special monthly compensation that includes aid and attendance. 38 CFR § 71.20(c)(1)-(4).

26.     At all times, plaintiffs provided caregiver services to eligible veterans as each veteran that they applied with for the Family Caregiver Program was a veteran who:

   a. Incurred or aggravated an injury or illness in the line of duty on or after September 11, 2001;
   b. Had a serious injury; and
   c. Required personal care services for a minimum of six continuous months.

27.     A veteran is awarded special monthly compensation that includes aid and attendance when the veteran requires assistance with activities of daily living, or for supervision or protection.  The need for aid and attendance means "helplessness or being so nearly helpless as to require the regular aid and attendance of another person." 38 CFR § 3.351(b). The criteria for aid and attendance is met when a veteran:

   a. Is blind, or so nearly blind as to have corrected visual acuity of 5/200 or less, in both eyes, or concentric contraction of the visual field to 5 degrees or less; or
   b. Is a patient in a nursing home because of mental or physical incapacity; or
   c. Establishes a factual need for aid and attendance under the criteria set forth in §3.352(a). 38 CFR §3.351 (c).

18

28.     The criteria for qualifying for the need for aid and attendance is:

"(a) *Basic criteria for regular aid and attendance and permanently bedridden.* The following will be accorded consideration in determining the need for regular aid and attendance (§3.351(c)(3): inability of claimant to dress or undress himself (herself), or to keep himself (herself) ordinarily clean and presentable; frequent need of adjustment of any special prosthetic or orthopedic appliances which by reason of the particular disability cannot be done without aid (this will not include the adjustment of appliances which normal persons would be unable to adjust without aid, such as supports, belts, lacing at the back, etc.); inability of claimant to feed himself (herself) through loss of coordination of upper extremities or through extreme weakness; inability to attend to the wants of nature; or incapacity, physical or mental, which requires care or assistance on a regular basis to protect the claimant from hazards or dangers incident to his or her daily environment."

38 CFR § 3.352 (May 24, 1995) (emphasis in the original).

29.     The criteria for receipt of special monthly compensation is set out in 38 CFR § 3.351(d):

"The rate of pension payable to a veteran who is entitled to pension under 38 U.S.C. 1521 and who is not in need of regular aid and attendance shall be as prescribed in 38 U.S.C. 1521(e) if, in addition to having a single permanent disability rated 100 percent disabling under the Schedule for Rating Disabilities (not including ratings based upon unemployability under § 4.17 of this chapter) the veteran:

(1) Has additional disability or disabilities independently ratable at 60 percent or more, separate and distinct from the permanent disability rated as 100 percent disabling and involving different anatomical segments or bodily systems, or

(2) Is 'permanently housebound' by reason of disability or disabilities. This requirement is met when the veteran is substantially confined to his or her dwelling and the immediate premises or, if institutionalized, to the ward or clinical area, and it is reasonably certain that the disability or disabilities and resultant confinement will continue throughout his or her lifetime."

38 CFR § 3.351(d).

30.     Pursuant to VHAD 1152(1), an eligible veteran is any individual who is a veteran; who incurred a serious injury or illness on or after September 11, 2001; has a service connected injury rendering the veteran in need of personal care services for a minimum of 6 continuous

months; a clinical determination has been made that it is in the best interest of the individual to participate in the program; personal care services that would be provided by the family caregiver will not be simultaneously and regularly provided by or through another individual or entity; the individual agrees to receive care at home after VA designates a family caregiver; and the individual agrees to receive ongoing care from a primary care team after VA designates a family caregiver. VHAD 1152(1), Para. 6.a.

31.     Pursuant to VHAD 1152 ((and 1152(1)), criteria establishing required personal care services for a minimum of six continuous months may be based on an "inability to perform one or more activities of daily living; a need for supervision or protection based on symptoms or residuals of neurological or other impairment or injury; or the individual is a Veteran who is service connected for a serious injury that was incurred or aggravated in the line of duty in the active military, naval, or air service on or after September 11, 2001, and has been rated 100 percent disabled for that serious injury, and has been awarded special monthly compensation that includes an aid and attendance allowance. ***NOTE:*** *Veteran must still meet the requirements in this paragraph 6.a., including needing personal care services from another individual (a caregiver) for a minimum of 6 continuous months."* VHAD 1152(1), Para. 6.a.(3)(a)-(c). (Note and emphasis in the original.)

32.     At all times, plaintiffs provided caregiver services to eligible veterans as each veteran that they applied with for the Family Caregiver Program was a veteran who:

    a.  Incurred or aggravated an injury or illness in the line of duty on or after September 11, 2001;
    b.  Had a serious injury; and
    c.  Required personal care services for a minimum of six continuous months.

33.     At all times the plaintiffs named in this complaint, and those who they seek to

represent, applied for compensation based on providing care for veterans who met the eligibility

criteria for the PCAFC, under the law and the relevant implementing regulations.

34.     The VHA has failed to properly determine and award eligibility for primary

family caregiver compensation and benefits as required by statute, regulations, and directives.

### Approval and Designation of Primary Family Caregiver Overview

35.     Congress established standards for assistance and support services for caregivers

in 38 U.S.C. § 1720G. Under that statute, the Secretary of Veterans Affairs and the Department

of Veterans Affairs are required to issue regulations to establish a program of comprehensive

assistance for family caregivers of eligible veterans.

36.     Pursuant to 38 U.S.C. § 1720G, codified in 38 CFR Chapter I, Part 71 ((in

substantial form as 76 FR 26172 (May 5, 2011)), the DVA established approval and designation

requirements for individuals to serve as a primary family caregiver.

37.     Individuals desiring to be primary family caregivers must "complete and sign a

joint application [with the veteran];" "[b]e at least 18 years of age;" "[b]e either the eligible

veteran's [family member], or someone who lives with the eligible veteran full-time or will do so

if designated as a Family Caregiver;" "have no founded determination of abuse or neglect by the

individual towards the veteran;" "[b]e initially assessed by a VA primary care team as being able

to complete caregiver education and training;" and "complete caregiver training and demonstrate

the ability to carry out the specific  personal care services, core competencies, and other

additional care requirements prescribed by the  eligible veteran's  primary care team." 38 CFR §

71.25(a)-(d).

38.     When an eligible veteran and co-applicant meet the family caregiver application

requirements, based on a clinical determination performed by the veteran's PCT, the application shall be approved, and a Primary and/or Secondary family caregiver will be designated. 38 CFR § 71.25(f).

39.     Under 38 U.S.C. § 1720G, and in response to 38 CFR § 71.25, the DVA created an approval and designation process as follows: "[t]he Veteran, and individuals who wish to be considered for designation by VA as primary or secondary family caregivers, must complete, sign, and submit VA Form 10- 10CG, or successor form, to VA;" "[u]pon receiving the application, a VA Caregiver Support Coordinator will evaluate eligibility by identifying a potentially qualifying injury;" require an individual be "at least 18 years of age;" and be either "[t]he Veteran's [family member]" or "[s]omeone who lives with the Veteran full time or will do so if designated as a family caregiver;" have the applicant be "assessed by a VA primary care team;" and "[c]omplete caregiver training." VHAD 1152, Para. 6.b.(1)-(3).

40.     When an eligible veteran and co-applicant meet the primary family caregiver application requirements, the application *shall* be approved, and a caregiver designated. VHAD 1152, Para. 6.b.(6).

41.     Each VA Medical Center's Chief of Staff is responsible for ensuring veterans and caregivers participating in and applying for the Program of Comprehensive Assistance for Family Caregivers are informed of their right to appeal clinical decisions, including denial of applications, in accordance with VHAD 1041, "Appeal of VHA Clinical Decisions." VHAD 1152, Para. 5.i.(4).

42.     Each VA Medical Center's Chief of Staff is responsible for ensuring that all appropriate providers (e.g., primary care, specialty care, and mental health providers) participate in clinical determinations concerning the veteran's eligibility for and participation in the Program

of Comprehensive Assistance for Family Caregivers, and that the timelines set forth in 38 CFR §§ 71.25 and 71.40 are met. VHAD 1152, Para. 5.i.(6).

43.     At all times relevant to the claims in this complaint, the plaintiffs met the eligibility criteria for approval as a primary family caregiver. Each plaintiff completed a joint application; was a family member, lived with the veteran full-time, or was willing to live with the veteran full-time; had no founded determination of abuse or neglect towards the eligible veteran; and was able and completed, or was able and willing to complete, training requirements.

44.     The DVA has failed to properly process, approve, designate, and compensate primary family caregivers as required by statute, regulations, and directives.

**Assistance, Services, and Benefits to Primary Family Caregivers Overview**

45.     Congress required, as part of the PCAFC program, that the Secretary provide to primary family caregivers of eligible veterans' specific assistance, including all benefits and services available to both General Caregivers and Secondary Family Caregivers; monthly caregiver stipend; respite care available for at least 30 days per year; and health care coverage. 38 U.S.C. §1720G, (3)(A)(i)-(ii).

46.     Pursuant to 38 U.S.C. § 1720G, codified in 38 CFR Chapter I, Part 71, and in substantial form as 76 FR 26172 (May 5, 2011), the DVA shall provide the following to primary family caregivers: online and in-person educational sessions; use of telehealth and other available technologies; teaching techniques, strategies, and skills for caring for the eligible or covered veteran; information concerning the supportive services available to caregivers, counseling and other services; respite care to eligible and covered veterans in support of the caregiver that is medically and age appropriate for the eligible or covered veteran (including 24-hour per day in-home respite care); healthcare; and a monthly stipend. 38 CFR § 71.40.

23

47.     Pursuant to 38 U.S.C. § 1720G, and to implement 38 CFR § 71.25, the DVA

reiterated the benefits required to be provided to a primary family caregiver: education and

training; ongoing technical support; mental health services; beneficiary travel; monitoring;

respite care; healthcare; and a monthly stipend. VHAD 1152, Para. 6.(c)-(d).

48.     In summary, a family caregiver is entitled to the following benefits: (1) respite

care; (2) continuing instruction and training; (3) ongoing technical support; (4) counseling; (5)

lodging; (6) healthcare; and (7) a monthly stipend.

49.     The DVA has failed to provide primary family caregivers services and assistance,

including a monthly stipend, as required by statute, regulations, and directives.

**Revocation from the Family Caregivers Program Overview**

50.     Under 38 CFR § 71.45, revocation from the Family Caregiver's Program may be

made by the Family Caregiver, the eligible veteran, or by the DVA. If the DVA makes the

revocation, it must be either because the veteran of the Family Caregiver no longer meets the

criteria for the program, or because the "VA makes the clinical determination that having the

Family Caregiver is no longer in the best interest of the eligible veteran." 38 CFR § 71.45.  "If

the revocation is due to improvement in the eligible veteran's condition, death, or permanent

institutionalization, the Family Caregiver will continue to receive caregiver benefits for 90 days,"

with some exceptions. *Id*.

51.     Each VA Medical Facility Director is responsible for providing written

notification to the patient or the patient's representative of the medical facility's final

determination as to clinical decisions, including revocation from the Family Caregiver Program.

This notification must describe the process and rationale that was used to reach the decision, and

also provide information on how the patient or patient's representative can appeal the medical

24

facility decision to the Veterans Integrated Services Network ("VISN"). VHAD 1041, Para.

5.b.(5). (VISNs are geographically divided administrative areas through which the DVA

provides healthcare services to veterans). The VA Medical Facility Director (also known as the

VA Medical Center Director) is also responsible for ensuring that patients and their

representatives are aware of their right to dispute a clinical decision and the processes involved

in appealing that decision. VHAD 1041, Para. 5.b.(2)

52.     Initial disputes about the VHA's decisions regarding PCAFC should be raised and

decided at the local VA Medical Facility. According to the VHAD 1041, "Every effort is made

to resolve dispute at point of care." However, "Clinical disputes not resolved at the clinical team

level should be elevated to the medical facility's Chief of Staff who will review, attempt to

resolve the dispute, and make a determination on the issue within five days." Under the same

directive, the "Chief of Staff provides written notification to the patient or the patient's

representative of the medical facility's final determination as well as information on how the

patient or patient's representative can appeal the medical facility decision to the VISN." If the

appellant does not agree with the outcome or decision of the Chief of Staff, then "Patient or

patient's representative can appeal to the VISN. The VISN has 30 days to complete review

unless an external review is requested."  VHAD 1041, Appendix A.

## INDIVIDUAL PLAINTIFFS' ALLEGATIONS

### Zamantha Tapia

53.     Zamantha Tapia is engaged to marry the eligible veteran, Mr. Cesar Silva, and is

Mr. Silva's current caregiver. Mr. Silva served in the United States Army from April 3, 2003, to

April 2, 2006, and in the Army National Guard from April 3, 2006, to April 5, 2010, as a tracked

vehicle mechanic.

54.     From November 6, 2003, to August 8, 2004, Mr. Silva deployed to Iraq. While serving in Iraq, Mr. Silva sustained serious injuries from a terrorist's attack and explosion, resulting in shrapnel injuries throughout his body. On June 4, 2009, Mr. Silva applied for VA Compensation and Pension (C&P) benefits as a result of his military and combat experience. On June 28, 2010, the DVA assigned him a 70% disability rating for numerous service connected disabilities, including the following: rotator cuff strain and impingement, chronic headaches, cervical spine degenerative joint disease, chronic lumbosacral strain, and left ulnar neuropathy, with a retroactive date of award to June 4, 2009.

55.     In 2010, as a result of disabilities sustained during his military service, Mr. Silva was medically discharged from the Army National Guard.

56.     Mr. Silva has been diagnosed with the following medical conditions: post-traumatic stress disorder ("PTSD"), traumatic brain injury ("TBI"), memory loss, depression, sleep apnea, scoliosis, kidney and liver problems, pre-cancer, severe irritable bowel syndrome, hearing impairments rotator cuff strain and impingement, chronic headaches, cervical spine degenerative joint disease, chronic lumbosacral strain, and left ulnar neuropathy.

57.     Mr. Silva applied for and was awarded Social Security Disability as a result of his service-connected disabilities, and is presently in receipt of Social Security Disability benefits.

58.     On February 11, 2014, Ms. Tapia and Mr. Silva jointly applied for the Family Caregiver Program. On July 1, 2014, the DVA denied their application stating Mr. Silva did not require assistance with ADLs for physical injuries, and his mental health conditions were not service connected, therefore, ineligible for consideration as a qualifying injury.

59.     The VHA did not notify Ms. Tapia and Mr. Silva of their appeal rights in the denial letter.

60.     Mr. Silva had a serious injury, as defined in 38 CFR §71.15, was an eligible veteran, required assistance with ADLs, protection, and supervision, and needed personal care services for a minimum of six months at the time of his and Ms. Tapia's application for the PCAFC.

61.     Pursuant to 38 CFR §71.20 and VHAD 1152, PCT input is required anytime an eligibility determination is made by the DVA because only a veteran's PCT may determine whether a veteran's injury requires personal care services for a minimum of six continuous months unless the veteran receives aid and attendance compensation.

62.     Despite the requirements that a veteran's PCT make a clinical determination regarding the need for personal care for six consecutive months, and to be included in any eligibility determination, the DVA refused to allow Mr. Silva's PCT to have any input into the decision to deny Family Caregiver Program eligibility; it also failed to solicit PCT input, and failed to review and utilize Mr. Silva's PCT provided medical records when deciding Ms. Tapia's Family Caregiver Program eligibility.

63.     On December 29, 2017, Ms. Tapia and Mr. Silva reapplied for the Family Caregiver Program, and the VHA conducted a phone assessment in conjunction with their application, instead of performing a personal exam or assessment.

64.     On February 9, 2018, the VHA denied their application based on Mr. Silva "not receiving medical treatment," and its conclusion that Ms. Tapia is "an enabler."

65.     From 2006 to present, Mr. Silva received and continues to receive treatment at a VA Medical Center and with civilian providers under the VA Choice Program, for his service connected disabilities.

66.     At the time of both of Ms. Tapia's applications to the PCAFC, Mr. Silva had

continuous medical treatment for his service connected conditions; the medical records

documenting this treatment, as well as the input of his PCT, were available when deciding

whether to grant or deny their Family Caregiver Program application. The DVA failed to review

Mr. Silva's relevant treatment records when making its eligibility determination regarding Ms.

Tapia's compensation and benefits.

67.     Despite the requirements that the veteran's PCT input be included in the

eligibility determination, the DVA again refused to consider Mr. Silva's PCT's input into their

Family Caregiver Program application, and the DVA failed to articulate a proper legal basis for

denying their December 29, 2017 application. Consideration of the PCT's input makes clear that

the determination of the VHA, in February 2018, that Mr. Silva "was not receiving medical

treatment," was clearly erroneous.

68.     At all times, from the 2014 PCAFC application to present, Mr. Silva was an

eligible veteran for DVA's Family Caregiver Program. Mr. Silva has multiple service connected

medical conditions requiring the 24-hour services of a caregiver. Mr. Silva requires assistance

with ADLs, supervision, and protection. Ms. Tapia provides these caregiver services to him.

69.     From 2014 to present, Ms. Tapia has provided Mr. Silva with assistance with

ADLs, supervision, and protection, including but not limited to the following: management of

medications; transfer between positions; assistance with bathing, mood regulation, sleep

regulation and pain management; the scheduling and reminders of medical appointments, daily

tasks; assistance with utilizing prescribed medical devices; and the caring for Mr. Silva's service

animal.

28

70.     The decisions of the DVA to deny Ms. Tapia's and Mr. Silva's Family Caregiver Program applications were arbitrary and capricious, contrary to law and regulation, were not based on substantial evidence, and denied Ms. Tapia pay and allowances that she was due as a result of her providing caregiver services. She should have been awarded and paid at a Tier level 3 compensation from her earliest date of eligibility.

**Mara Dunn**

71.     Mara Dunn is married to the eligible veteran, Sterling Dunn, and is Mr. Dunn's current caregiver. Mr. Dunn served in the United States Army from January 18, 2006, to June 25, 2009, as a Joint Fire Support Specialist in the rank of Specialist.

72.     From May 1, 2007, to October 31, 2007, Mr. Dunn deployed to Afghanistan. During his deployment, Mr. Dunn sustained serious injuries and became disabled due to being burned, suffering concussions, having a TBI, PTSD, and other service related disabilities. On June 25, 2009, as a result of disabilities sustained during his military service, Mr. Dunn was medically retired from the Army with an 80% Department of Defense ("DoD") disability rating.

73.     In June 2009, Mr. Dunn applied for Social Security Disability, was awarded Social Security Disability, and is presently in receipt of Social Security Disability benefits.

74.     On June 26, 2009, Mr. Dunn applied for VA C&P benefits as a result of his military and combat experience. In February 2010, Mr. Dunn received a VA disability rating of 100%. On March 27, 2015, his VA rating became 100% permanent and total, with an award of special monthly compensation for aid and attendance, with a retroactive effective date of June 26, 2009.

75.     On March 1, 2011, Mr. and Mrs. Dunn jointly applied for the Family Caregiver Program. The VHA approved their application on May 1, 2011, and assigned a Tier level 2 to the compensation awarded to Mrs. Dunn. The proper Tier level should have been Tier level 3.

76.     Under VHADs 1152, 2006-057, and 1041, veterans and caregivers participating in and applying for the Family Caregiver Program must be informed of their right to dispute and to appeal, clinical decisions and be informed of the appeal process.

77.     VA medical facility directors are responsible for providing written notification to the patient or the patient's representative of the medical facility's final determination regarding PCAFC decisions. This notification must describe the process and rationale that was used to reach the decision and provide information on how the patient or patient's representative can appeal the medical facility decision to the Veterans Integrated Services Network ("VISN"). VHAD 1041, Para. 5.b.(5).

78.     The Dunns were not informed of the legal basis for Tier level 2 assignment, provided written notice or justification, or notified of their right to appeal Tier level 2 assignment. By failing to notify them and allow for a clinical dispute, the Dunns were denied not only the right to appeal at the local DVA facility but also their appellate rights before the VISN. They should have been initially assigned a Tier level 3 based on the facts and evidence in their case. Their entitlement to monies and this claim is based, in part, on the continuing claim doctrine. See Bevevino v. United States, 87 Fed. Cl. 397 (2009).

79.     In 2015, the Dunns requested an increase in Mr. Dunn's Tier level assignment. A member of Mr. Dunn's PCT performed the assessment and recommended an assignment of Tier level 3. Rather than utilize Mr. Dunn's PCT assessment, the Caregiver Eligibility Team ("CET")

sent Mr. Dunn to another individual to perform an assessment, not a member of his PCT. That provider recommended Tier level 2.

80.     On April 29, 2015, after Mr. Dunn's PCT recommended Tier level 3 and another individual recommended Tier level 2, the Dunns were terminated from the Family Caregiver Program. The VHA terminated them from the PCAFC without stating a reason for the decision. After soliciting Congressional input, they were informed that the Dunns failed to provide proof that Mr. Dunn was receiving care at the VA Medical Center. This issue was not and is not a dispositive issue or criterion for the award of PCAFC benefits. However, prior to termination, the Dunns provided 28 pages of medical records from the VA Medical Center showing that Mr. Dunn was receiving continued care at the VA Medical Center. The Dunns sent these documents to the CET before revocation; subsequently, Mr. Dunn had two assessments completed by DVA personnel, which were included in his medical records.

81.     The VHA failed to explain the basis of the revocation decision or to provide the Dunns with written notification as to how to appeal, as required by law, regulation, and directive.

82.      In 2018, Mrs. Dunn filed a complaint with the White House hotline (https://www.va.gov/ve/whvahotline.asp) regarding the Family Caregiver Program, which was forwarded to their local VA Medical Facility. The CET contacted the Dunns after receiving the message from the White House hotline. On September 6, 2018, the Dunns reapplied for the Family Caregiver Program. As part of the application process, a telephone assessment was completed by a member of the CET.  On September 28, 2018, their application was denied.

83.     In the notification of the denial for PCAFC compensation in 2018, the DVA stated that eligibility for the PCAFC was not proper, based on "no medical records or evidence

reflecting treatment for mental health or that a caregiver is required to provide personal care services for the veteran's safety due to the veteran's mental health injury."

84.　At all times from their original application in 2011 to present, Mr. Dunn was an eligible veteran for DVA's caregiver program. Mr. Dunn has multiple service connected medical conditions that require the 24-hour services of a caregiver. Mr. Dunn requires assistance with ADLs, supervision, and protection. Mr. Dunn was awarded special monthly compensation for aid and attendance with an effective date of June 26, 2009, which was before the VHA's revocation of the Dunns Family Caregiver Program eligibility on April 29, 2015, and subsequent denial of their reapplication.

85.　Mrs. Dunn continues to provide care to her husband for ADLs, supervision and protection, including remind her husband to perform essential tasks such as eating, take prescribed medications and schedule appointments, assists with bathing, transfers him between positions, and provides assistance with mood and sleep regulation. Mr. Dunn's risk of falling and diminished mental capacity prevents him from performing most ADL and necessitate supervision and protection.

86.　The DVA's decision to terminate the Dunns from the Family Caregiver Program, and all actions denying them proper compensation and benefits, were arbitrary and capricious; contrary to law, regulation and directive; were not based on substantial evidence; and denied Mrs. Dunn pay and allowances that she was due as a result of providing caregiver services in accordance with the requirements of the PCAFC.

### Jennifer Wilmot

87.　Jennifer Wilmot is married to the eligible veteran, George Wilmot, and is Mr. Wilmot's current caregiver.

88.     Mr. Wilmot served in the United States Army and the Army National Guard from 1991 to July 27, 2001, and October 10, 2007, to May 27, 2013. From December 14, 2008, to November 20, 2009, Mr. Wilmot deployed to Iraq. On November 16, 2009, in Mosul, Iraq, he sustained serious injuries and incurred disabilities including the following: TBI, PTSD, left arm limb salvage, right scapula rebuild, traumatic brain injury, back fractures, pelvic fractures, loss of use of left arm, muscle and tissue loss in left arm, brachial artery radial nerve transected left arm, stenosis of back, head lacerations, memory loss, migraines, and tinnitus.

89.     On or about August 2010, prior to Mr. Wilmot's retirement from the Army, he applied for Social Security Disability. Shortly after applying, his application was approved, and he remains in receipt of Social Security Disability benefits.

90.     On May 27, 2013, Mr. Wilmot was medically retired from the Army with a DoD disability rating of 90%. On the same day, Mr. Wilmot applied for VA C&P benefits as a result of his military and combat incurred disabilities. The DVA, in August 2013, determined that he was service connected for numerous medical conditions and assigned a VA disability rating of 100%, retroactive to May 28, 2013.

91.     Also, on May 27, 2013, the Wilmot's jointly applied for the Family Caregiver Program. The VHA approved their application on August 31, 2013, and assigned Tier level 2 to the compensation awarded to Mrs. Wilmot. The proper Tier level should have been Tier level 3.

92.     The DVA did not provide Mr. and Mrs. Wilmot the legal basis for Tier level 2 assignment or their right to appeal Tier level 2 assignment. By failing to notify and allow for a clinical dispute, the Wilmot's were not only denied the right to appeal at the local DVA facility but also to their VISN, as required by VHADs 1152 and 2006-57.

93.     On August 31, 2015, the DVA terminated the Wilmots from the Family Caregiver Program with the following justification: "After completing a comprehensive review of your medical records it appears that you have met the intention of the program and your participation will be discontinued." The stated basis for revocation did not address the legal criteria for revocation and was arbitrary, capricious, contrary to law and unsupported by substantial evidence. Whether Mr. Wilmot's serious injury rendered him in need of personal care services for a minimum of six continuous months was a clinical determination that was required to be made or authorized by his PCT. Under 38 CFR § 71.20, PCT input is required anytime an eligibility determination is being made. Despite the requirements that PCT input be included in the eligibility determination, the DVA refused to include Mr. Wilmot's PCT in the decision. When the DVA made the decision, all of Mr. Wilmot's medical records were not considered by the DVA.

94.     In May 2017, the Wilmots reapplied for the Family Caregiver Program. On May 23, 2017, medical providers performed an electromyography ("EMG") on Mr. Wilmot, which showed significant deficits in his left arm, back, and neck.

95.     On June 30, 2017, the VHA denied the Wilmots' application, stating: "Did not meet clinical eligibility – The veteran's medical records do not indicate there are significant deficits in Activities of Daily Living (ADLs) nor incapable of completing most of the Instrumental Activities of Daily Living (IADLs). Or records to indicate a need for supervision and protection based on the following evidence: Current medical records do not provide support for the dysfunction reported. The CET was unable to find medical causes for falls when walking, confinement to a wheelchair, and/or why he could not be independent in ADLs if he was confined to a wheelchair."

34

96.     Like the previous eligibility determination when their caregiver program eligibility was revoked, Mr. Wilmot's PCT was denied input into the decision of the VHA, and the DVA failed to review all VA and non-VA medical records. The VHA failed to consider his May 23, 2017, EMG results.

97.     In 2018, Mrs. Wilmot filed a complaint with the White House hotline (https://www.va.gov/ve/whvahotline.asp) and a local caregiver-support member followed up with her. Mrs. Wilmot was advised by this person to reapply to the PCAFC program. Mrs. Wilmot asked who would make the eligibility determination. Mrs. Wilmot was informed their application would be reviewed by the same individuals who recently denied their application.

98.     At all times from application to present, Mr. Wilmot was an eligible veteran for DVA's Family Caregiver Program at a Tier level 3. Mr. Wilmot has multiple serious, service connected injuries requiring the 24-hour services of a caregiver. Mr. Wilmot required assistance with ADLs, supervision, and protection when the DVA erroneously and wrongfully revoked his and his wife's PFCAC eligibility.

99.     From 2013 to present, Mrs. Wilmot has continually provided care to her husband, including medication management, bathing, transportation, transfer between positions, picking him up when he falls, and providing him with supervision and protection.

100.    The DVA's decisions to assign a Tier level 2 benefit instead of a Tier level 3 benefit, and to revoke, and later deny the Wilmots' Family Caregiver Program application were arbitrary and capricious, contrary to law and regulation, not based on substantial evidence, and denied Mrs. Wilmot pay and allowances that she was due as a result of providing caregiver services in accordance with the requirements of the PCAFC.

### Jennifer Crisostomo

101.    Jennifer Crisostomo is married to the eligible veteran, Kenneth Crisostomo, and is Mr. Crisostomo's current caregiver.

102.    Mr. Crisostomo served in the United States Army, from April 3, 2004, to September 19, 2013, as a combat medic in the rank of Specialist.  From April 24, 2004, to March 23, 2005, Mr. Crisostomo deployed to Afghanistan, and from July 7, 2006, to July 10, 2007, he deployed to Iraq. As a result of his combat experience and military service he sustained serious injuries and was diagnosed with the following injuries and conditions: lumbar degenerative disc disease, PTSD and depression, left knee injury, left ankle injury, right hip injury, right shoulder injury, lumbar radiculopathy, sleep apnea, and tinnitus.

103.    In November 2012, while on active duty, Mr. Crisostomo applied for Social Security Disability. In December 2013, he was awarded Social Security Disability, backdated to December 2011, and he is presently in receipt of Social Security Disability benefits.

104.    On September 19, 2013, as a result of his injuries, he was medically retired from the Army with a DoD disability rating of 70% and a 100% VA disability rating.

105.    In 2013, Mr. Crisostomo appealed his VA C&P benefits which were awarded as a result of his military and combat incurred disabilities. On or about December 2014, the DVA finalized his case, and he was assigned a VA disability rating of 100%, to include an award of special monthly compensation for aid and attendance, retroactive to September 20, 2013.

106.    On July 21, 2014, the Crisostomos applied for the Family Caregiver Program. The DVA approved their application on December 1, 2014, many months after they applied, and assigned Tier level 2 to the compensation awarded to Mrs. Crisostomo.  The proper Tier level should have been Tier level 3.

107.    The VHA did not inform the Crisostomos of the legal basis for their Tier level 2 assignment, nor did it provide written notice of their right to appeal Tier level 2 assignment. By failing to notify them and allow for a clinical dispute, the Crisostomos were denied the right to appeal to the local DVA medical facility, as well as to their VISN, as required by VHAD 2006-057.

108.    In April 2017, a Veteran's Eligibility Assessment Team ("VEAT") conducted a reassessment (with members of the VEAT including a psychologist, a social worker, and an occupational therapist).

109.    On August 7, 2017, the VHA revoked the Crisostomos from the PCAFC. The DVA failed to provide written notification to Mr. and Mrs. Crisostomo when revocation was initiated, as required by VHAD 1152, Para. 5.j.(13).

110.    The VHA was required and failed, as part of the revocation process, to comply with VHAD 1152, Para. 7.d, which states:

> "Regardless of the reason for revocation, clear direct communication with the Veteran and the family caregiver must be maintained throughout the revocation process. Every effort should be made to meet in person about the revocation; otherwise a telephone call is an acceptable alternative. The Veteran and the family caregiver must also be notified in writing of the revocation. The written notification must include information on how to appeal. See VHAD 1041, Appeal of VHA Clinical Decisions, or subsequent policy issue."

111.    Pursuant to 38 CFR § 71.20, a veteran with a service connected serious injury may establish eligibility without an inability to perform ADLs or need for protection or supervision. A veteran with a service connected serious injury, rated 100% disabled, and awarded special monthly compensation to include aid and attendance, is deemed to require personal care services for a minimum of six continuous months. 38 CFR § 71.20(c). Mr. Crisostomo received special monthly compensation for aid and attendance, rendering him

eligible for the program without proof of an inability to perform ADLs, or a need for supervision

or protection for six continuous months.

112.    The VHA revoked their PCAFC eligibility in August 2017, based on Mr.

Crisostomo allegedly not having a qualifying serious injury. The VHA stated that, "As discussed,

the VEAT did not find you required a caregiver for daily Activities of Daily Living (i.e. feeding,

dressing, toileting, etc.) **for safety purposes** and in relation to your potentially qualifying

injuries of PTSD or back injury(ies). Additionally, you were not found to meet the minimum

impairment standard to qualify your PTSD as a 'serious injury.' For reference, the minimum

impairment standard establishes a veteran have the following: 'Behavior is considerably

influenced by delusions or hallucinations OR Serious impairment, in communication or

judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR

Inability to function in almost all areas (e.g., stays in bed all day, no job, home, or friends)." The

VEAT's statement, as a basis for revocation, did not meet, state, or properly apply the criteria for

revocation from the PCAFC, under applicable law and regulation.

113.    Mr. Crisostomo's PCT mental health provider consistently added addendums to

his medical records that were continually ignored and not reviewed when making his eligibility

determination. His VA Medical Center records, which were available to the VEAT and the

VHA, state that Mr. Crisostomo would likely be institutionalized if Mrs. Crisostomo were not

caring for him.

114.    On March 23, 2018, the Crisostomos reapplied for the Family Caregiver Program.

In April 2018, after they reapplied, a reassessment was performed with a VEAT, including a

psychologist, a social worker, and an occupational therapist.  On June 19, 2018, the DVA denied

their application, stating, "While your mental health condition is serious, it does not meet the

minimum impairment standard required by law for it to be considered a serious injury." The

DVA denied the Crisostomos application even though Mr. Crisostomo had been awarded 100%

for PTSD, to include special monthly compensation for aid and attendance.

115.    Despite the requirements that PCT input be included in the eligibility

determination, the DVA failed to seek or consider Mr. Crisostomo's PCT's input.

116.    At all times from application in 2014 to present, Mr. Crisostomo was an eligible

veteran for DVA's caregiver program at a Tier level 3 basis. He required supervision and

protection because he could not manage his medications, or schedule or maintain appointments;

and because he was a suicide risk. Mr. Crisostomo also required assistance with activities of

daily living (ADLs). Furthermore, he was and is receiving special monthly compensation for aid

and attendance from the DVA. Mrs. Crisostomo continues to provide assistance with her

husband's ADLs and provides him supervision and protection, including, but not limited to,

planning and organizing, financial management, provision of medications, scheduling of doctors'

appointments, and driving him for all necessary local travel. She also attends all his medical

appointments and stays with him as he cannot be left home alone, cannot cook because of a

history of burning himself, and has a history of suicidal ideation. He also has a documented

history of daily delusions and hallucinations. Mrs. Crisostomo has also been appointed as Mr.

Crisostomo's VA fiduciary, as he has been deemed incompetent to take care of his own finances.

All of these details have been documented in Mr. Crisostomo's medical records and, while

available to the VHA, were not considered in making its determinations regarding Mrs.

Crisostomo's eligibility and compensation under the PCAFC.

117.    The DVA's decisions to initially assign a Tier level 2 compensation rate instead

of a Tier level 3 rate, to revoke the Crisostomos' Family Caregiver Program eligibility, and to

deny their subsequent applications were arbitrary and capricious, contrary to law, regulation and directive, were not based on substantial evidence, and denied Mrs. Crisostomo pay and allowances that she was due as a result of providing caregiver services in accordance with the requirements of the PCAFC.

### Kimberly Colon

118.    Kimberly Colon is married to the eligible veteran, Stuart Colon, and is Mr. Colon's current caregiver. Mr. Colon served in the Army from October 9, 1987, with several breaks in service, until October 27, 2009.

119.    From April 28, 2003, to July 4, 2004, Mr. Colon deployed to Iraq as an infantryman in the rank of Sergeant. While deployed, Mr. Colon sustained serious injuries including PTSD, TBI, and back injuries. On October 27, 2009, Mr. Colon was medically retired from the Army with a 60% DoD disability rating.

120.    In June 2009, prior to retiring, Mr. Colon applied for VA C&P benefits. On March 24, 2010, he received a VA rating of 60% for the following conditions: PTSD, degenerative disc disease post spinal fusion, gastroesophageal reflux disease with hiatal hernia and Barrett's esophagus, right retropatellar pain syndrome, left ankle condition, hypertension, and scars, retroactive to, October 28, 2009.

121.    Additionally, in 2008, while on active duty, Mr. Colon applied for Social Security Disability. Shortly after he was awarded Social Security Disability benefits because he was unable to work and engage in substantially gainful activities as a result of his disabilities. He remains in receipt of Social Security Disability benefits.

122.    In February 2011, Mr. Colon appealed his VA rating. In December 2017, the DVA awarded him individual unemployability, retroactive to 2015. As a result of his earlier

appeals, on September 10, 2018, he was assigned an individual unemployability permanent and total rating, and awarded special monthly compensation for being housebound, retroactive to October 27, 2009.

123.    To be eligible for special monthly compensation for housebound generally, a veteran must have a service connected disability rated as total and (1) have an additional service connected disability or disabilities independently rated at 60% or higher, or (2) be permanently housebound. 38 U.S.C. § 1114.

124.    In May 2011, the Colons applied for the Family Caregiver Program. On July 13, 2011, the DVA approved their application, and they were assigned Tier level 3 compensation. The DVA began paying Mrs. Colon at that rate shortly thereafter.

125.    In October 2015, the Colons notified the DVA that they would be moving from Florida to North Carolina. On October 27, 2015, an annual in-home assessment was completed, and the DVA provided the Colons with forms to complete for transferring between caregiver regions. The Colons completed and returned those forms to DVA.

126.    On December 2, 2015, the Colons relocated to North Carolina. On December 30, 2015, the DVA conducted an in-home assessment of Mr. Colon's condition and care.

127.    On or around January 6, 2016, the Colons' caregiver supervisor added an addendum to the notes from the assessment, stating, "Current Eligibility Assessment will need to be completed on this Veteran as a transfer." The supervisor added this note after the assessment was completed.

128.    On January 11, 2016, the VHA reduced the Colon's Tier level 3 to Tier level 2. They were informed verbally that the reduction was because of "the scores" received on the assessment.

41

129.     The VHA failed to seek or accept PCT input from any provider in making its

decision to reduce the Colons' Tier level. Mr. Colon's primary care provider stated the following

in response to Mrs. Colon's question regarding his input into the assessment or caregiver

determination: "Unfortunately, the undersigned really has very little input with this program,

other than to be aware that it is occurring..."

130.     After appealing the Tier reduction, Mrs. Colon asked why Mr. Colon's PCT was

not included in this decision.  The VISN6 Director responded, "With regard to your concern that

Mr. [....], your husband's Primary Care Provider was not included in the decision-making

process, I have asked that the Caregiver Support Program Supervisor to be sure that a Veteran's

Primary Care Provider be added to the CEA notes as an additional signer."

131.     On July 14, 2016, the VHA conducted an annual in-home assessment for the

Colons. The nurse's notes state, "No recommendations to change tier level at this time. No

changes in tier level determined by appeal system."

132.     On October 31, 2016, a social worker completed a clinical eligibility assessment

("CEA") for the Colons.

133.     On November 2, 2016, the VHA reduced the Colons from Tier level 2 to Tier

level 1. They were verbally informed that the reduction was due to "scores" on the CEA and later

received a reduction notification letter. Again, no input was sought or considered from Mr.

Colon's PCT. The VHA's letter stated that some of Mr. Colon's medical records were reviewed

and specified which records were considered in making the reduction decision, but not all of his

records were reviewed. Within ten months of moving from Florida to North Carolina, the Colons

were reduced from Tier level 3 to Tier level 1, despite no improvement or change in Mr. Colon's

disabilities, and without any basis in law, regulation, or directive supporting the reductions.

42

134.     In July 2018, the VHA conducted an annual in-home assessment of Mr. Colon's condition and care.  Before the assessment, Mrs. Colon contacted the caregiver coordinator and requested Mr. Colon's PCT complete the assessment, which was denied. Mrs. Colon's inquiry was forwarded to the Medical Center Director, who responded in writing that VHAD 1152 "is supported by both statute and regulations. As we previously advised, we believe it is appropriate for local facilities to utilize a multidisciplinary team or individual provider to complete eligibility determinations, so long as the Veteran's primary care team is completing the necessary authorizations and providing input into determinations." "As VA considers changes to the PCAFC regulations and policy to address the requirements of the recently-enacted VA MISSION Act of 2018, we will seek to clarify the role of primary care teams in PCAFC eligibility determinations."

135.     On November 8, 2018, the VHA revoked the Colons from the Family Caregiver Program. The Clinical Evaluation Team ("CET") did not seek or consider any input from the PCT in making the revocation decision. The Colons provided the CET with civilian medical care records, which were also not considered. The Colons caregiver coordinator told them to wait a year before reapplying for the PCAFC, which is contrary to law, regulation, and directive.

136.     The DVA was required to but failed to provide clear direct communication with the Mr. and Mrs. Colon throughout the revocation process and meet with them in person.

137.     DVA failed to provide written notification to Mr. and Mrs. Colon when revocation was initiated as required by VHA Directive 1152, Para. 5.j.(13).

138.     At all times from the January 11, 2016 Tier level 3 reduction, revocation from the caregiver program, and continuing to the present, Mr. Colon was eligible for the PCAFC program at a Tier level 3.  He was terminated from the program within two months of the DVA

awarding him a permanent and total rating, with the award of special monthly compensation for being housebound.

139.    Mr. Colon requires assistance with ADLs, including grooming and bathing, movement, dressing, and medication dispensation. Mrs. Colon provides him with supervision and protection. She schedules and drives him to medical appointments, dispenses the 23 pills he takes each day, cooks and cleans for him, and helps him move out of bed, as he is unable to do these tasks without assistance. Mr. Colon walks with a cane, has suicidal ideation, sleeps only 2-3 hours a night due to hypervigilance, has nightmares, flashbacks, short-term and long-term memory loss, mood changes, and is unable to help care for his children due to these physical and mental issues.

140.    The DVA's decision to reduce the Colons' Family Caregiver Program Tier level and revoke the Colon's family caregiver program eligibility was arbitrary and capricious, contrary to law, regulation, and directive, was not based on substantial evidence, and denied Mrs. Colon pay and allowances that she was due as a result of providing caregiver services in accordance with the requirements of the PCAFC.

**Melissa Larson**

141.    Melissa Larson is engaged to marry the eligible veteran, Josue Acevedo, and is his current caregiver.

142.    Mr. Acevedo served in the U.S. Army from May 18, 2004, to March 15, 2008, as an infantryman in the rank of Specialist. From January 24, 2005, to June 10, 2005, Mr. Acevedo deployed to Iraq.

143.    While deployed, Mr. Acevedo sustained serious injuries, including PTSD, TBI, right shoulder disability, back disability, and hand injuries.

144.     On March 15, 2008, Mr. Acevedo was medically retired from the military with a DoD disability rating of 40%.

145.     In September 2008, he was awarded Social Security Disability benefits due to his inability to engage in substantial gainful activities. He continues to receive Social Security Disability benefits.

146.     Shortly after his medical retirement from the Army, Mr. Acevedo applied for VA C&P benefits. On December 9, 2008, he was rated 100% permanent and total from the VA for the following: TBI, PTSD, right shoulder condition, back problems, right ankle injury, right hand injury, and GERD.

147.     In 2012, Mr. Acevedo and his previous caregiver applied for the Family Caregiver Program. On April 2, 2012, the VHA approved the application and assigned a Tier level 2.

148.     Between the time of initial application and 2016, Mr. Acevedo's Tier level was increased from Tier level 2 to Tier level 3. In September 2016, an assessment was completed continuing Mr. Acevedo as Tier level 3. Mr. Acevedo's Tier level was later reduced from Tier level 3 to Tier level 2.

149.     In May 2017, an annual in-home assessment was completed, and Mr. Acevedo was continued at Tier level 2.

150.     In 2017, Mr. Acevedo informed the DVA that he was the what as relocating from New York to Texas and wanted to change his Family Caregiver from his then current provider to Ms. Larson. Mr. Acevedo called the New York caregiver coordinator asking to remove his then Family Caregiver and substitute with Ms. Larson. The New York region DVA informed him that relocation and the new designation of a caregiver would not be a problem. Mr. Acevedo also

informed the Texas region DVA that he was relocating and was informed new family caregiver designation would not be a problem.

151.    On August 21, 2017, Mr. Acevedo relocated to Texas where Ms. Larson resided. Ms. Larson's application should have been completed prior to his move to Texas, but the DVA failed to do so.

152.    Upon relocation, Mr. Acevedo enrolled in the Texas VA healthcare system. Immediately, he met with multiple VA providers who were part of his new PCT.

153.    In September 2017, Mr. Acevedo's Family Caregiver Program eligibility was terminated, without input from Mr. Acevedo's PCT, despite his eligibility and health remaining unchanged.

154.    The VHA did not inform Mr. Acevedo in writing of his termination from the PCAFC, of the basis for the termination, or his appeal rights.

155.    On September 27, 2017, Ms. Larson and Mr. Acevedo met with a DVA social worker to discuss the revocation. The social worker informed them that they needed to reapply for the PCAFC, in part because, "When you move, you have to do another application." This compelled revocation and reapplication is contrary to law, regulation, and directive. Mr. Acevedo and Ms. Larson received no prior correspondence regarding their termination or basis for termination.

156.    The next day, on September 28, 2017, Ms. Larson and Mr. Acevedo again applied for the Family Caregiver Program. On February 12, 2018, their application was denied without specifics, other than the allegation that Mr. Acevedo failed to meet the eligibility criteria: "Clinical information reviewed does not indicate a serious psychological or physical injury that renders you in need of assistance for everyday functions for a minimum of six continuous

months." Their application was denied one-year after the DVA completed an assessment continuing Mr. Acevedo at Tier level 3 due to mental health injuries, based on the need for supervision and protection. Ms. Larson and Mr. Acevedo were again not provided with a written notice of their appeal rights.

157.    On March 9, 2018, Ms. Larson and Mr. Acevedo appealed the termination decision with the local VA Medical Center. On April 20, 2018, the VHA denied their appeal without legal bases for doing so.

158.    Pursuant to VHADs 1152 and 1041, an individual may appeal a local clinical decision to their VISN. On May 31, 2018, they appealed to the VISN. The VISN appeal was not processed because the VHA stated it was "procedurally incorrect" to send the appeal directly to the VISN. They had previously submitted their VISN appeal to the local VAMC for processing, but it was denied as untimely, which is why they appealed directly to the VISN. Their appeal was not untimely, and even if it were, it should have been excused because the substantive issues raised merited relief.

159.    At all times relevant to this complaint, Mr. Acevedo had a serious injury, as defined in 38 C.F.R. § 71.15. Whether Mr. Acevedo's serious injury rendered him in need of personal care services for a minimum of six continuous months had to be clinically authorized or determined by his PCT. 38 C.F.R. § 71.20(c).

160.    From 2017 to the present, Ms. Larson has continued to provide caregiver services to Mr. Acevedo due to the many requirements of his medical conditions. Mr. Acevedo requires assistance with ADLs, grooming, bathing, dressing, administering medical devices, cooking (due to memory and attention issues that have previously resulted in him burning food and leaving the

stove on), and with scheduling and attending medical appointments. In addition, Mr. Acevedo

suffers from hallucinations, has suicidal ideations, and requires care for his safety and protection.

161.    The DVA's decisions to revoke Mr. Acevedo's from the PCAFC and to deny Ms.

Larson's and Mr. Acevedo's Family Caregiver Program application were arbitrary and

capricious, contrary to law, regulation, and directive, and not based on substantial evidence.

These wrongful actions denied Ms. Larson the compensation and benefits she was due as a result

of her provision of caregiver services, in accordance with the requirements of the PCAFC.

## CLASS ALLEGATIONS

162.    This complaint is filed on behalf of the named plaintiffs and all other individuals

similarly situated. The DVA has evaluated each plaintiff's and proposed class member's

entitlement to primary Family Caregiver Program eligibility and has rendered a final decision in

each case. The class consists of all previous, current, or denied caregivers of veterans who:

     a.  Are veterans of the United States Air Force, Army, Coast Guard, Marine Corps, and Navy;

     b.  Served in the United States military on or after September 11, 2001;

     c.  Were found to have a service connected medical condition;

     d.  Applied for the DVA's Primary Family Caregiver Program;

     e.  Were denied Primary Family Caregiver Program eligibility, were revoked from the Primary Family Caregiver Program or were erroneously assigned to or reduced in Tier level; and

     f.  Were not provided with the correct allowances and pay, services, and a monthly stipend that they were due under law and regulation.

163.     The members of the Class are so numerous that joinder of all members is

impracticable.

164.    While the exact number of class members are not presently known to plaintiffs

and can only be ascertained through discovery, plaintiffs know that between May 5, 2011, and

September 30, 2018, more than 100,000 applications for DVA's Primary Family Caregiver

Program were received. Thousands were wrongfully determined ineligible for the program,

terminated from the program, erroneously assigned low Tier levels, or reduced in Tier level by

the DVA using the disputed and complained-about standards and procedures alleged in this

complaint that do not comply with the law, regulations, or directives.

165.    This complaint involves common questions of law and fact, including but not

limited to:

     a.   Whether the procedures, regulations, and practices of the DVA in evaluating
and adjudicating Primary Family Caregiver Program compensation and
benefits comply with 38 U.S.C. §1720G, and its command to "establish a
program of comprehensive assistance for family caregivers of eligible
veterans," and "provide support under the program," with respect to the
plaintiffs and proposed class members;

     b.   Whether the procedures, regulations, and practices of the DVA in evaluating
and adjudicating Primary Family Caregiver Program eligibility,
compensation, and benefits comply with 38 CFR Chapter I, Part 71, and its
command to "implement the Program of Comprehensive Assistance for
Family Caregivers," and "provide certain benefits to eligible veterans who
have incurred or aggravated serious injuries during military service, and to
their caregivers," with respect to the plaintiffs and proposed class members;

     c.   Whether the procedures, regulations, and practices of the DVA in evaluating
and adjudicating Primary Family Caregiver Program eligibility,
compensation, and benefits comply with VHAD 1152 (or the amended
version, dated October 4, 2018), and its command to "establish a Program of
Comprehensive Assistance for Family Caregivers," and "Provide education
and training, respite care, mental health services, beneficiary travel (to attend
required caregiver training and for an eligible veteran's medical
appointments), a monthly stipend payment, and access to health care (if
qualified) through the Civilian Health and Medical Program of the
Department of Veterans Affairs (CHAMPVA) as set forth in this directive, to
specified approved family caregivers of qualified veterans with a serious

injury incurred or aggravated in the line of duty on or after September 11, 2001," with respect to the plaintiffs and proposed class members;

d. Whether the procedures, regulations, and practices of the DVA in amending VHAD 1152 on October 4, 2018, creating "Standard Operating Procedures for the Program of Comprehensive Assistance for Family Caregivers and Standard Operating Procedures: Staff Training, Education and Consultation," which are not available to the public, and the application of the procedures to the plaintiffs and proposed class members comply with 38 U.S.C. § 1720G, and 38 CFR Part 71, which require the DVA to "establish a program of comprehensive assistance for family caregivers of eligible veterans," and "provide support under the program," and "implement the Program of Comprehensive Assistance for Family Caregivers," and "provide certain benefits to eligible veterans who have incurred or aggravated serious injuries during military service, and to their caregivers";

e. Whether the failure of the DVA to ensure a veteran's PCT provides input into a DVA eligibility determination for Primary Family Caregiver services violated applicable laws, regulations, and directives with respect to the plaintiffs and proposed class members;

f. Whether the failure of the DVA to ensure a veteran's medical records are thoroughly reviewed and considered when making an eligibility and compensation determination is arbitrary and capricious, contrary to laws, regulations, and directives, or render the decision not based on substantial evidence with respect to the plaintiffs and proposed class members; and

g. Whether the DVA unlawfully denied Primary Family Caregiver eligibility and accurate Tier level awards to plaintiffs and proposed class members denying them monies due; and

h. Whether the DVA complied with VHAD 2006-057 and VHAD 1041 by properly notifying plaintiffs and proposed class members of their appeal rights after denial, reduction or revocation of PCAFC compensation and benefits, and whether the appeals process and decisions were in compliance with the law and applicable regulations.

166. The named plaintiffs' claims are typical of the class. The named plaintiffs will adequately and fairly protect the interests of the class, and they are represented by legal counsel experienced at the administrative level, including before the Department of Veterans Affairs, and

in litigation before this Court in military pay cases, and before the U.S. Court of Appeals for Veterans Claims regarding Department of Veterans Affairs decisions and denials.

167.     The actions of the United States and the DVA have generally affected the entire class, thus making final relief appropriate with respect to the class as a whole. The common questions of law and fact involved in this action thus predominate over individual questions. Class action treatment is the superior method of fair and efficient adjudication of this controversy because it permits numerous persons to prosecute their common claims jointly in a single forum and thus avoids unnecessary duplication and the potential for inconsistent rulings. A class action provides an efficient and manageable method to adjudicate plaintiffs and the proposed class members' rights and entitlements under the law.

**COUNT I**
**(38 U.S.C. § 1720G)**

168.     Plaintiffs re-allege and incorporate by reference the allegations contained in paragraphs 1 through 167 of this complaint.

169.     38 U.S.C. § 1720G confers a substantive right to monetary benefits against the United States by specifying monthly stipend, services, and benefits to be paid to a qualified caregiver of an eligible veteran.

170.     Plaintiffs and the proposed class members have been denied the proper caregiver stipend, services, and benefits to which they are entitled under 38 U.S.C. § 1720G, as a result of the defendant's failure to comply with the laws, regulations, and directives applicable to the plaintiffs and the proposed class members, as alleged in this complaint. The DVA's wrongful actions include:

    a.   The failure to properly determine eligibility in the adjudication of Family Caregiver Applications;

51

b.   The failure to properly decide compensation under the mandated criteria and standards;

c.   The failure to properly provide benefits, services, and assistance to caregivers of veterans;

d.   The failure to seek or allow Primary Care Team input when making eligibility determinations;

e.   The failure to consider all medical records when making an eligibility and compensation decision;

f.   The failure to designate Primary Care Team members and to consider their input in making decisions about eligibility and compensation; and

g.   The improper automatic termination of caregiver eligibility or requirement of a reassessment or reapplication whenever an eligible veteran and family caregiver relocate to a new VISN region.

**COUNT II**
**(38 CFR §71.20)**

171.   Plaintiffs re-allege and incorporate by reference the allegations contained in paragraphs 1 through 167 of this complaint.

172.   38 CFR §71.20 confers a substantive right to monetary benefits against the United States when a veteran meets the eligibility criteria. Specifically, a monthly stipend, services, and benefits to be paid to a qualified caregiver of an eligible veteran.

173.   Plaintiffs and the proposed class members have been improperly denied eligibility for the PCAFC. The DVA has consistently failed to consider Primary Care Team input, refused to allow Primary Care Team input, refused to designate Primary Care Team members, failed to consider more than one injury as a basis for eligibility, required Veterans Benefits Administration designation of service connection before approving an application, and refused to consider an award of aid and attendance as clinical criteria for PCAFC awards.

**COUNT III**
**(38 CFR §71.40)**

174.    Plaintiffs re-allege and incorporate by reference the allegations contained in paragraphs 1 through 167 of this complaint.

175.    38 CFR §71.40 confers a substantive right to monetary benefits against the United States when a veteran meets the eligibility criteria. Specifically, a monthly stipend, services, and benefits to be paid to a qualified caregiver of an eligible veteran.

176.    Plaintiffs and the proposed class members have been unlawfully denied caregiver benefits as a result of the defendant's failure to comply with the laws and regulations applicable to the Plaintiffs and the proposed class members, as alleged in this complaint. The DVA has failed to provide monthly stipend and services to caregivers, failed to correctly clinically rate and determine caregivers' Tier level, and has failed to properly justify the reasons and bases for Tier level assignment, denial of eligibility, and revocation.

**COUNT IV**
**(38 CFR §71.45)**

177.    Plaintiffs re-allege and incorporate by reference the allegations contained in paragraphs 1 through 167 of this complaint.

178.    38 CFR §71.45 confers a substantive right to monetary benefits against the United States when a veteran meets the eligibility criteria. Specifically, a monthly stipend, services, and benefits to be paid to a qualified caregiver of an eligible veteran.

179.    Plaintiffs and the proposed class members have been unlawfully denied eligibility for the PCAFC program, revoked from the program, assigned a low Tier level, or reduced in Tier level, as a result of the defendant's failure to comply with the laws and regulations applicable to the plaintiffs and the proposed class members, as alleged in this complaint. The DVA has

unlawfully required reassessment of eligibility when transferring between VISN regions, terminated eligibility when transferring between regions with or without an assessment, compelled reapplication when transferring between regions, failed to consider all medical records or ensure the records are in the veteran's file when making an eligibility or compensation decision, failed to consider Primary Care Team input, refused to allow Primary Care Team input, and failed to justify Tier level assignment or denial of eligibility in accordance with this regulation. The DVA has failed to continue Family Caregiver benefits and services for 90 days after termination and failed to justify why revocation is proper based on a veteran or caregiver no longer meeting the eligibility criteria.

## COUNT V
## (VHAD 1152)

180.     Plaintiffs re-allege and incorporate by reference the allegations contained in paragraphs 1 through 167 of this complaint.

181.     VHAD 1152 confers a substantive right to monetary benefits against the United States when a veteran meets the eligibility criteria for the Family Caregiver Program.

182.     Plaintiffs and the proposed class members have been improperly denied eligibility, reduced, terminated, or revoked from the PCAFC as a result of defendant's failure to comply with their own Directive, as alleged in this complaint. The DVA has unlawfully required reassessment of eligibility when transferring between VISN regions, has terminated eligibility when transferring between regions without an assessment, has failed to consider all medical records or ensure the records are in the veteran's file, has failed to consider Primary Care Team input, refused to allow Primary Care Team input, refused to designate primary care team members, and has failed to justify Tier level assignment or denial of eligibility in the PCAFC.

183.    The VHA has also failed to follow and properly apply the provisions of VHAD

2006-057 and VHAD 1041 (as applicable), as required by VHAD 1152, when denying, reducing,

or revoking benefits for the plaintiffs and the proposed class members.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray that this Court enters judgment against the defendant and

award the following relief:

      a.  Certify this action as a class action on behalf of the proposed Class;

      b.  Designate Ms. Tapia, Mrs. Dunn, Mrs. Wilmot, Mrs. Crisostomo, Mrs. Colon, and Ms. Larson as representatives of the Class;

      c.  Designate plaintiffs' counsel of record as Class Counsel;

      d.  Enjoin the DVA from continuing its unlawful practices described in this complaint;

      e.  Award the plaintiffs monetary benefits that formulaic in nature in an amount to be determined at trial;

      f.  Award plaintiffs their costs and attorney's fees; and

      g.  Grant such other relief as this Court deems just and proper.

Respectfully submitted,

Counsel of Record:

s/Jason E. Perry
Jason E. Perry
LAW OFFICE OF JASON PERRY, LLC

10540 Galleria Street
Wellington, FL 33414
(203) 887-6967 (phone)
(800) 576-5648 (fax)
jason.perry@jeperrylaw.com

Dated: January 21, 2019

Of Counsel:

s/Luke D. Miller
Luke D. Miller
MILITARY DISABILITY LAWYER, LLC

1567 Edgewater St. NW
PMB 43
Salem, OR 97304
(800) 392-5682 (phone)
(570) 779-1091(fax)
luke@militarydisabilitylawyer.comc
Dated: January 21, 2019

*Counsel for the Plaintiffs*